UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-14035-CR-ROSENBERG/MAYNARD

UNITED STATES OF AMERICA

v.

GARY HENDRY,

          **Defendant.**

_____/

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR DOWNWARD VARIANCE**

Comes now the United States of America, by and through the undersigned Assistant United States Attorney, and hereby submits its Response to the Motion for Downward Variance filed by the defendant, Gary Hendry ("Hendry"), in the above-captioned case:

**BACKGROUND**

On July 11, 2019, a federal grand jury in the Southern District of Florida returned an indictment charging TentLogix, Inc. ("TentLogix"), Hendry, Dennis Birdsall ("Birdsall"), and Kent Hughes ("Hughes") with conspiring to harbor aliens for the purpose of commercial advantage or private financial gain in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) (Count One), and Hendry and Birdsall with causing false statements to be made in a matter within the jurisdiction of the executive branch of the United States in violation of Title 18, United States Code, Section 1001(a)(2) (Count Two). (Doc. No. 1.) On September 25, 2019, Hendry pleaded guilty to the conspiracy charge pursuant to a written plea agreement with the United States. (Doc. Nos. 82-87, 96.)[1]   Hendry also agreed to forfeit $282,789.00 to the United States, which

---

[1] Hughes pled guilty to the conspiracy charge on August 2, 2019, and was sentenced to three years

1

represents the amount of gross proceeds Hendry personally obtained as a result of his participation in the conspiracy.  (Doc. No. 83.)  Hendry satisfied his forfeiture obligation to the United States on September 25, 2019.

Hendry's sentencing hearing is scheduled for December 5, 2019.  The Presentence Investigation Report ("PSI") shows his advisory sentencing guideline range to be 37 – 46 months based on a total offense level of 21 and criminal history category of I, which includes a six-level enhancement under USSG § 2L1.1(b)(2)(B) because the offense involved the harboring of at least 25 but less than 100 aliens, a four-level enhancement under USSG § 3B1.1(a) for being an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, and a two-level enhancement under USSG § 3C1.1 for obstruction of justice.  (PSI at ¶¶ 34-43, 96.)

On November 26, 2019, the United States filed a motion pursuant to USSG § 5K1.1 requesting the Court to depart downward from the bottom of Hendry's advisory guideline range to reflect the substantial assistance he provided to the United States.  (Doc. No. 153.)  That motion remains pending.

On November 20, 2019, Hendry filed a Memorandum in Aid of Sentencing, in which he requests a downward variance pursuant to 18 U.S.C. § 3553(a).  (Doc. No. 141.)  Specifically,

---

of probation and a $7,500 fine, after the Court granted the United States' motion for downward departure under USSG § 5K1.1.  (Doc. Nos. 38-40, 42, 52, 99, 111-12.)  Birdsall pled guilty to the conspiracy charge on August 19, 2019, and was sentenced to five years of probation and a $15,000 fine.  (Doc. Nos. 63-65, 67, 69, 139.)  Birdsall agreed to forfeit $170,943.00 to the United States, which represents the amount of gross proceeds Birdsall personally obtained as a result of his participation in the conspiracy.  TentLogix pled guilty to the conspiracy charge on November 12, 2019, and is scheduled to be sentenced on December 5, 2019.  TentLogix agreed to forfeit $3,033,946.46 to the United States, which represents the amount of gross proceeds TentLogix obtained as a result of its participation in the conspiracy.  TentLogix has yet to satisfy its forfeiture obligation.

Hendry seeks a non-custodial sentence of "home confinement." The United States respectfully submits a downward variance is not warranted, and that a sentence at the bottom of Hendry's advisory guideline range, after taking into account the United States' motion for downward departure pursuant to USSG § 5K1.1, is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate general deterrence, and avoid unwarranted sentencing disparities.

## ANALYSIS

### *Nature and Circumstances of the Offense*

As with any request for a variance, the nature and circumstances of the offense present a good starting point.

TentLogix is a Florida corporation that was established in 1996. TentLogix provides event-related services, including the rental and installation of tents and other temporary structures, for private and corporate gatherings throughout the continental United States. TentLogix is headquartered in Fort Pierce, Florida, and employs hundreds of workers, many of whom are manual laborers. (PSI at ¶ 9.)

From January 2016 to March 2018, TentLogix employed scores of aliens knowing those aliens had entered and remained in the United States unlawfully. During this time frame, a large portion of TentLogix's workforce in the Southern District of Florida was comprised of aliens who were not authorized to work in the United States. (PSI at ¶ 10.)

Hendry founded TentLogix and is the chief executive officer and majority owner of the corporation. In 2016, TentLogix generated more than $21,000,000 in gross receipts and $10,000,000 in gross profit from its business operations. In 2017, TentLogix generated more than $36,000,000 in gross receipts and $14,000,000 in gross profit from its business operations. (Doc.

No. 84, Stipulation of Facts and Acknowledgment of Offense Elements in Support of Guilty Plea, at pg. 1; PSI at ¶¶ 11-12.)  By all accounts, 2017 was a banner year for TentLogix – built off the sweat and toil of an illegal workforce.

On April 11, 2016, Homeland Security Investigations ("HSI") served TentLogix with a Notice of Inspection.  A Notice of Inspection is the procedure by which HSI initiates an audit of a business's employment records.  HSI requested TentLogix to produce Form I-9s for all of its employees.  Form I-9 is used for verifying the identity and employment authorization of individuals hired for employment in the United States.  All United States employers must ensure proper completion of Form I-9 for each individual they hire for employment in the United States. (Doc. No. 84 at pg. 2; PSI at ¶ 13.)

On April 26, 2016, TentLogix provided HSI with Form I-9s for approximately 164 employees in response to the Notice of Inspection.  On July 19, 2016, based on a review of the Form I-9s that TentLogix provided, HSI identified 96 TentLogix employees who appeared to be aliens unauthorized to work in the United States.  HSI provided TentLogix with a list of the 96 employees, and warned TentLogix it could be subject to criminal charges if it continued to employ these aliens.  Hendry was aware of HSI's audit and HSI's admonition to TentLogix that it could be subject to criminal charges if it continued to employ aliens who were not authorized to work in the United States.  (Doc. No. 84 at pg. 2; PSI at ¶ 14.)

To be clear, HSI provided TentLogix with the opportunity to bring itself into compliance with federal law in lieu of facing criminal sanctions.  Instead of heeding HSI's admonition, TentLogix, through its corporate officers, Hendry and Birdsall,[2] orchestrated a façade of

---

[2] Birdsall is the president of TentLogix and was promoted to that position in 2017, at the height of the conspiracy.  (Doc. No. 148, TentLogix PSI at ¶ 34.)

4

compliance that permitted the corporation to continue profiting from the use of illegal labor for at least another year. Specifically, in early 2017, Hendry, Birdsall, and Hughes met at Hendry's residence in Martin County, Florida, and devised a scheme to "transfer" the aliens employed by TentLogix who were not authorized to work in the United States to KH Services, LLC ("KH Services"), which was to be established by Hughes, so that they no longer appeared on TentLogix's payroll. Hughes and Hendry were childhood friends and Hendry manipulated that relationship to convince Hughes to participate in the conspiracy. The purpose of the scheme was to conceal, harbor, and shield the aliens who worked for TentLogix from HSI's audit. Hendry was the architect of the unlawful scheme. To put it in Hendry's own words, "[t]he genesis of the idea was mine and mine alone." Hendry agreed to cover all of the costs associated with KH Services, and agreed to pay Hughes a fee for each alien who was transferred from TentLogix's payroll to KH Services' payroll. (Doc. No. 84 at pgs. 2-3; PSI at ¶ 15; Doc. 129 at pg. 2.)

Hendry directed Birdsall to make GMC, who was a supervisor at TentLogix, aware of the scheme. At Hendry's behest, Birdsall directed GMC to tell the aliens employed by TentLogix to obtain new identities, including social security numbers, which GMC did. GMC was primarily responsible for recruiting the aliens who worked for TentLogix, most of whom were from Guatemala. (Doc. No. 84 at pg. 3; PSI at ¶ 16.)

Hendry then directed Birdsall to tell TentLogix's attorney to falsely represent to HSI that TentLogix was in the process of terminating the 96 employees HSI had identified during its audit as aliens not authorized to work in the United States. (Doc. No. 84 at pg. 3; PSI at ¶ 17.) Over the course of several communications in 2017, TentLogix notified HSI, through its counsel, that most of the aliens identified by HSI had been terminated. These communications were made between TentLogix's attorney and HSI Special Agent Dadre McCreary. Simply put, TentLogix,

5

through its corporate officers, intentionally duped an unwitting attorney into lying to a federal law enforcement agency.

On March 20, 2017, Hughes formed KH Services for the sole purpose of concealing, harboring, and shielding the aliens employed by TentLogix from HSI's audit. In April 2017, Birdsall delivered a $10,000 check to Hughes issued by TentLogix and made out to KH Services. On April 19, 2017, Hughes opened an account at Wells Fargo in Martin County in the name of KH Services and deposited the $10,000 check into that account. Hughes was the sole member and manager of KH Services. Hughes operated KH Services out of his residence in Martin County. (Doc. No. 84 at pg. 3; PSI at ¶ 18.)

On May 5, 2017, TentLogix, through its attorney, lied to HSI and falsely represented that 92 of the 96 aliens identified by HSI during its audit had been terminated when, in fact, those aliens continued to work for TentLogix under the guise of being employed by KH Services. (Doc. No. 84 at pg. 3; PSI at ¶ 20.)

In May 2017, most of the employees HSI had previously identified as aliens not authorized to work in the United States were transferred from TentLogix's payroll to KH Services' payroll. These aliens continued to work for TentLogix while purportedly being employed by KH Services. (Doc. No. 84 at pg. 3; PSI at ¶ 19.)

Between May 2017 and March 2018, TentLogix transferred over $3,000,000 to KH Services in 23 separate wire transfers for the express purpose of paying the aliens who continued to work for TentLogix. At Hendry's direction, Birdsall provided Hughes with the hours worked and hourly rate for each alien on a bi-weekly basis based on timesheets he maintained at TentLogix. Birdsall maintained a code or "Rosetta Stone" that permitted him to identify each alien so that they correlated with the timesheets he provided to Hughes. Hughes then transmitted

6

this information to Paychex, Inc. ("Paychex"), a payroll services provider, so that paychecks drawn on KH Services' bank account at Wells Fargo were generated for the aliens who worked for TentLogix. After the paychecks were issued, Birdsall obtained the paychecks from Hughes and caused them to be distributed to the aliens at TentLogix's headquarters in Fort Pierce. (Doc. No. 84 at pgs. 4; PSI at ¶¶ 21-22.)

On March 28, 2018, HSI executed a federal search warrant at TentLogix's headquarters in Fort Pierce. The façade of compliance finally collapsed. During the execution of the search warrant, HSI encountered and interviewed no less than 30 of the aliens TentLogix previously advised had been terminated, several of whom provided false identities to law enforcement at the scene. These aliens worked for TentLogix but received their paychecks through KH Services. Contrary to Hendry's representation, HSI is not aware of a single DACA recipient that was arrested or encountered during its investigation of TentLogix.

To recap, Hendry orchestrated a fraudulent scheme that spanned several years, resulted in the harboring of at least 92 aliens, involved the formation and use of a shell company, the obstruction of a criminal investigation, and the use of an innocent attorney who repeatedly lied to a federal law enforcement agency at TentLogix's behest. There is a distinct absence of mistake in how Hendry perpetrated this crime. Hendry's actions were purposefully calculated to deceive.

As for Hendry's motive, he benefited directly and substantially from the conspiracy. In 2017, during the height of the conspiracy, TentLogix generated more than $36,000,000 in gross receipts and $14,000,000 in gross profit from its business operations. From April 2016 until March 2018, Hendry withdrew over $1,000,000 from TentLogix's bank account. Hendry profited financially more than any other member of the conspiracy.

Moreover, this was not a trivial crime. It is no secret that one of the primary reasons for illegal immigration is the chance of employment in the United States. The ability of illegal aliens to find and keep jobs depends to a considerable extent on unscrupulous employers willing to either look the other way, or, as here, actively obstruct immigration authorities. When enacting Section 1324, Congress expressly noted the pervasive problem of illegal alien employment and its harmful effect on the American worker. *United States v. Zheng*, 306 F.3d 1080, 1087 (11th Cir. 2002). Indeed, "[e]ach time an employer hires an illegal alien, an American citizen loses an employment opportunity." *Id*. Congress understood this problem and chose to penalize employers for hiring illegal aliens and harboring them from detection.

Hendry, however, claims Congress did not intend for Section 1324(a) to serve as a vehicle for prosecuting businesses who knowingly employ illegal labor as a cost-cutting mechanism. This argument is puzzling – at best. Section 1324(a) was enacted in 1952 and remained unchanged until 1986. The current version of Section 1324(a)(1)(A)(iii), which provides the basis for the conspiracy charge in this case, is nearly identical to the pre–1986 version, which provided that a person who "willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection [an illegal alien], in any place, including any building or any means of transportation," is guilty of a felony. 8 U.S.C. § 1324(a)(3) (1982); *see also* 8 U.S.C. § 1324 note (West 2006). However, there is one important difference. The pre–1986 version of Section 1324(a) had also stated: "Provided, however, [t]hat for the purposes of this section, *employment* (including the usual and normal practices incident to employment) *shall not be deemed to constitute harboring*." 8 U.S.C. § 1324(a) (1982) (emphases added). Significantly, Congress removed that exception when it revised the statute in 1986. *See* The Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, § 112(a), 100 Stat. 3359, 3381–82 (1986).

8

That is to say, "after the 1986 amendment, § 1324 no longer excluded employment from the prohibition against harboring." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1299 (11th Cir. 2010) (internal marks and citation omitted). The message Congress sought to relay to employers by virtue of that retraction could not have been clearer. "Congress obviously sought not only to deter employers from directly joining forces with those who bring in illegal aliens but also to prevent employers from encouraging the practice by hiring aliens knowing that they had been brought in illegally." *Id.* at 1293 (11th Cir. 2010).

Notwithstanding the foregoing, Hendry still insists that Congress "set a maximum punishment of six (6) months' confinement" for "employing undocumented workers as a business practice." First and foremost, Hendry did far more than simply employ "undocumented workers as a business practice." To be sure, Hendry perpetrated an elaborate fraud against HSI that spanned several years and resulted in the obstruction of a criminal investigation. Had Hendry simply employed "undocumented workers as a business practice," he very likely would only be facing a maximum punishment of six months' confinement. As with many white collar cases, the cover up is worse than the crime. In any event, the Eleventh Circuit has rejected this argument as well. *Id.*

To the extent Hendry seeks to politicize this prosecution by claiming it is a product of "the present administration," he is mistaken. The United States has consistently prosecuted harboring by employment cases, at least over the last decade. *See United States v. Nguyen*, 637 F. App'x 699 (3d Cir. 2016) (prosecution for harboring aliens by employment); *United States v. McClellan*, 794 F.3d 743 (7th Cir. 2015) (same); *United States v. Mei Juan Zhang*, 789 F.3d 214 (1st Cir. 2015) (prosecution for conspiring to harbor aliens by employment); *United States v. Acambaro Mexican Restaurant, Inc.*, 631 F.3d 880 (8th Cir. 2011) (prosecution for harboring aliens by

employment); *United States v. Yang*, 390 F. App'x 859 (11th Cir. 2010) (prosecution for conspiring to harbor aliens by employment); *United States v. Tipton*, 518 F.3d 591 (8th Cir. 2008) (same); *United States v. Khanani*, 502 F.3d 1281 (11th Cir. 2007) (same); *United States v. Shum*, 496 F.3d 390 (5th Cir. 2007) (same).

As for Hendry's claim that it was "impossible to continue in business without violating the law," he clearly misses the mark. TentLogix is still in business and appears poised to succeed for years to come, *without the use of illegal labor*. Indeed, the United States would not have negotiated a reduced forfeiture amount with TentLogix had it believed TentLogix was destined to fail. The United States anticipates TentLogix will satisfy its forfeiture obligation to the United States over the course of the next several years. The fact TentLogix is able to operate and succeed without the use of illegal labor simply begs the question – why did the corporation turn to illegal labor in the first place? The answer is simple – greed. Of course, profits are bigger when labor costs are reduced. But that is the dilemma nearly every *potential* white collar criminal faces – increase profits by violating the law or learn to live with a smaller profit margin. Hendry chose the former, and now he must suffer the consequences. To be clear, TentLogix was founded based on the use of illegal labor and enjoyed the fruits of an illegal workforce for many years. Hendry seems to imply HSI created the problem by auditing his company in the midst of a banner year (as if there is ever a good time to get caught violating the law). To the contrary, HSI performs these audits to protect our domestic economy and the American worker, not to hassle businesses.

The nature and circumstances of the present offense counsel against a downward variance.

### *History and Characteristics of the Defendant*

The United States acknowledges Hendry's criminal history is minimal. Hendry's lack of criminal history, however, has already been adequately taken into account by virtue of his criminal

history designation (Category I).  Indeed, Criminal history category I is the lowest category, and "the lower limit of the guideline range for Criminal History Category I is set for a first offender with the lowest risk of recidivism." U.S.S.G. § 4A1.3 (policy statement).  On the other hand, the fact Hendry turned to crime later in life is particularly disconcerting.

The United States does not dispute that Hendry's background reveals instances of good character on his part.  Nevertheless, Hendry's prior good deeds, on balance, do not negate the gravity of his conduct and aggravating role he played within the conspiracy.  A variance based on Hendry's lack of criminal history is simply not appropriate in this case.  Criminal defendants are not entitled to receive "credits" for their prior good deeds to offset the prospect of incarceration. To hold otherwise would encourage white collar defendants to engage in risk/reward calculations before they commit financial crimes based on how many "good deeds" they have accumulated or how much money they have contributed to charitable causes.

### *The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, Afford Adequate Deterrence, and Protect the Public from Further Crimes of the Defendant*

The offense Hendry now stands convicted of is both serious and dangerous to the administration and enforcement of federal immigration law.  "[T]he legislative history of the adoption of § 3553 demonstrates [that] Congress viewed deterrence as particularly important in the area of white collar crime." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal marks and citation omitted).  That is because white collar crime, more so than most other offenses in the criminal code, "can be affected and reduced with serious punishment." *Id*.  A non-custodial sentence in the form of home confinement would send the message that white collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty.  Rather than deter crime, a non-custodial sentence would suggest to those similarly

11

situated to Hendry that they can profit from fraudulent conduct and, even if caught, escape severe consequences by cooperating with the government after the fact. The threat of spending time on probation or home confinement simply does not, and cannot, provide the same level of deterrence as the threat of incarceration in a federal penitentiary for a meaningful period of time. This Court can and should send a message to the local business community that knowingly hiring illegal aliens and lying about the practice to law enforcement will result in a federal prison sentence.

As the Eleventh Circuit recently cautioned in *United States v. Kuhlman*:

> [B]usiness criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. *Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.*

711 F.3d 1321, 1329-30 (11th Cir. 2013) (internal marks and citation omitted; emphasis added).

A guideline sentence is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and most importantly, afford adequate general deterrence.

### *Parity in Sentencing*

Finally, Hendry should expect to be treated like other similarly-situated defendants. Parity in sentencing among similarly-situated federal defendants across the country is fundamental to the proper administration of justice. This principle is embodied in Section 3553(a)(6), which "is concerned with national disparities among the many defendants with similar backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007). Generally, "national uniformity is . . . taken into account by the Sentencing Guidelines,

which are almost certainly the best indication of ordinary practice since most sentences are within the guidelines." *Id*. at 626 (internal marks and citation omitted). "Even after *Booker* rendered the Sentencing Guidelines advisory, district courts have *in the vast majority of cases* imposed either within-Guidelines sentences or sentences that depart downward from the Guidelines on the Government's motion." *Hughes v. United States*, 138 S.Ct. 1765, 1777 (2018) (internal marks and citation omitted; emphasis added).

A sentence at the bottom of Hendry's guideline range, after taking into account the United States' motion for downward departure pursuant to USSG § 5K1.1, adequately reflects the relevant 3553(a) factors, preserves the integrity of the Sentencing Guidelines, and promotes national uniformity by avoiding unwarranted sentencing disparities.

## CONCLUSION

For the above stated reasons, the United States requests the Court to impose a sentence at the bottom of Hendry's guideline range, after taking into account the United States' motion for downward departure pursuant to USSG § 5K1.1.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:    **/s/Michael D. Porter**
Michael D. Porter
Assistant United States Attorney
Florida Bar# 0031149
101 South U.S. Highway 1
Suite 3100
Fort Pierce, Florida 34950
Telephone: (772) 293-0950
Email:michael.porter2@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on December 4, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by either regular U.S. mail or inter-office delivery.

                                              **/s/Michael D. Porter**
                                              Michael D. Porter
                                              Assistant United States Attorney