UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   19-14035-CR-ROSENBERG/MAYNARD

UNITED STATES OF AMERICA

v.

GARY HENDRY,

Defendant.
_____/

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE AND OTHER RELIEF**

Comes now the United States of America, by and through the undersigned Assistant United States Attorney, and hereby submits its Response in Opposition to the Motion for Modification of Sentence and Other Relief filed by the defendant, Gary Hendry ("Hendry"), in the above-captioned case.   The United States respectfully submits: (1) the Court lacks the authority to grant Hendry the relief he seeks until he exhausts his administrative remedies; (2) reducing Hendry's sentence of imprisonment to home confinement is inconsistent with the Section 3553(a) factors; and (3) Hendry has failed to establish extraordinary and compelling reasons justifying a modification of his sentence.

**BACKGROUND**

On July 11, 2019, a federal grand jury in the Southern District of Florida returned an indictment charging TentLogix, Inc. ("TentLogix"), Hendry, Dennis Birdsall ("Birdsall"), and Kent Hughes ("Hughes") with conspiring to harbor aliens for the purpose of commercial advantage or private financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count One), and Hendry and Birdsall with causing false statements to be made in a matter within the jurisdiction of the

executive branch of the United States in violation of 18 U.S.C. § 1001(a)(2) (Count Two).   (Doc. No. 1.)   Shortly thereafter, Hendry was arraigned and released on a $250,000 personal surety bond.   (Doc. Nos. 19, 22.)

On September 25, 2019, Hendry pleaded guilty to the conspiracy charge pursuant to a written plea agreement with the United States.   (Doc. Nos. 82-87, 96.)   Hendry also agreed to forfeit $282,789.00 to the United States, which represents the amount of gross proceeds Hendry personally obtained as a result of his participation in the conspiracy.   (Doc. No. 83.)

The Presentence Investigation Report ("PSI") established an advisory sentencing guideline range of 37 – 46 months based on a total offense level of 21 and criminal history category of I, which included a six-level enhancement under USSG § 2L1.1(b)(2)(B) because the offense involved the harboring of at least 25 but less than 100 aliens, a four-level enhancement under USSG § 3B1.1(a) for being an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, and a two-level enhancement under USSG § 3C1.1 for obstruction of justice.   (PSI at ¶¶ 34-43, 96.)

The United States filed a motion pursuant to USSG § 5K1.1 requesting the Court to depart downward from the bottom of Hendry's advisory guideline range by 20 percent to reflect the substantial assistance he provided to the United States, which the Court granted.   (Doc. No. 153; Sentencing Transcript at pgs. 5-8.)

On December 20, 2019, the Court sentenced Hendry to a term of imprisonment of one year and one day, to be followed by 3 years of supervised release, which represented a downward variance from his advisory guideline range.   (Doc. Nos. 173, 177.)   The Court also imposed a $75,000 fine against Hendry.   (Doc. No. 177.)   Without objection from the United States, the

Court permitted Hendry to remain on bond and ordered him to self-report to the Federal Bureau of Prisons ("BOP") on or before April 20, 2020.   (*Id.*)

On April 20, 2020, Hendry reported to FCI Jesup in Jesup, Georgia, to begin service of his sentence.   At that time, Hendry also submitted a request to the warden at FCI Jesup for "expedited home confinement," which BOP now has expanded authority to grant under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).   In short, the CARES Act, coupled with the Attorney General's Memorandum to BOP dated April 3, 2020,[1] gives BOP broad discretion to expand the use of home confinement during the COVID-19 pandemic.   *Id.* at § 12003(b)(2).   Hendry's request for expedited home confinement is currently under review by BOP.[2]   Hendry's scheduled release date according to BOP is February 24, 2021, which appears to include unearned good-time credit.

On April 21, 2020, Hendry filed the instant motion, in which he requests the Court to modify his sentence to home confinement pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).   (Doc. No. 182.)[3]

---

[1] https://www.justice.gov/file/1266661/download (Apr. 24, 2020).

[2] Prior to issuing a ruling, BOP will examine Hendry and assess his medical condition and BOP's ability to address any health risks Hendry may have related to COVID-19 or otherwise.   When an inmate makes a request for compassionate release with the warden, BOP conducts an extensive assessment.   When the request is based on the inmate's medical condition, BOP gathers and considers the details of the condition and prognosis, including all relevant test results, consultations, and referral reports/opinions, as well as the inmate's plan for release.   The review is conducted by the warden, BOP General Counsel, the BOP Medical Director and/or the Assistant Director of the Correctional Programs Division, depending on the nature of the request, and ultimately the Director of BOP.   *See* 28 C.F.R. § 571.62.

[3] Prior to the filing of the instant motion, the United States advised counsel for Hendry that the United States did not object to an extension of Hendry's self-surrender date by 30 days, with the ability to revisit the length of such extension in the future should the circumstances warrant. Hendry opted to report and begin service of his sentence instead.

## ANALYSIS

A federal district court generally may not modify or revisit a sentence of imprisonment once it has been imposed.   Indeed, "[t]he authority of a district court to modify an imprisonment sentence is *narrowly* limited by statute."   *United States v. Phillips*, 597 F.3d 1190, 1194-95 (11th Cir. 2010) (emphasis added).   A district court has the authority to consider a request to modify or reduce a defendant's sentence in the following limited circumstances: (1) a motion for sentence reduction under 18 U.S.C. § 3582(c); (2) a motion pursuant to Federal Rule of Criminal Procedure 35; or (3) a remand following an appeal pursuant to 18 U.S.C. § 3742.   *See* 18 U.S.C. § 3582(b-c); *cf.* 28 U.S.C. § 2255 (permitting defendants to request the court which imposed the sentence to vacate, set aside or correct the sentence under limited circumstances).

Hendry is proceeding under Section 3582(c)(1)(A)(i) which provides, in relevant part, as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
>> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant *after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier,* may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>>
>>> (i) *extraordinary and compelling reasons warrant such a reduction*;
>>>
>>> . . . .

4

*and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*[.]

(emphases added).[4]

In order to modify a sentence and grant compassionate release under Section 3582(c)(1)(A)(i), a district court must engage in a three-step process. First, the Court must find that the defendant has fully exhausted all administrative rights to appeal any failure by BOP to bring such a motion on his behalf or that 30 days have expired from the receipt of such a request by the warden of the facility where the defendant is incarcerated. 18 U.S.C. § 3582(c)(1)(A). Second, the Court must consider the Section 3553(a) factors. 18 U.S.C. § 3582(c)(1)(A)(i). Third, the Court must find that "extraordinary and compelling reasons warrant such a reduction." *Id*.; *see also United States v. Stuyvesant*, 2020 WL 1865771, at *2 (S.D. Fla. Apr. 14, 2020) (Altman, J.).[5]

The burden is on Hendry to satisfy each of these thresholds, and it is a heavy burden that he bears. *See, e.g.*, *United States v. Hylander*, 2020 WL 1915950, at *2 (S.D. Fla. Apr. 20, 2020) (Bloom, J.).

**A.      *The Court Lacks the Authority to Grant Hendry Relief under Section 3582(c)(1)(A).***

Hendry has failed to allege that he exhausted all administrative rights to appeal any failure by BOP to bring a motion for compassionate release on his behalf, or that 30 days have expired

---

[4] Section 3582(c)(1)(A) was amended by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018). Prior to the First Step Act, only BOP, rather than defendants themselves, could bring a motion for compassionate release under Section 3582(c)(1)(A).

[5] In some cases, the Court must also consider whether the defendant poses a danger to the safety of any other person or the community. The United States does not contend Hendry presents a danger to the safety of any other person or the community.

from the receipt of such a request by the warden of the facility where he is incarcerated.[6]   This failure alone is fatal to his plea for a sentence reduction.

The statutory exhaustion requirement contained in Section 3582(c)(1)(A) is mandatory in nature and cannot be waived.   To that end, several federal courts have concluded that a district court cannot entertain a First Step Act motion unless a defendant has exhausted his administrative remedies—even in the face of the COVID-19 pandemic.   *See United States v. Raia*, __ F.3d __, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (concluding that failure to exhaust administrative remedies prior to submitting request for sentence modification under Section 3582(c)(1)(A)(i) based on COVID-19 pandemic presented "a glaring roadblock foreclosing compassionate release[.]"); *United States v. Woolley*, 9:19-cr-80093, Doc. No. 105 (S.D. Fla. Apr. 17, 2020) (Rosenberg, J.) ("Under binding precedent, the Court lacks the authority to excuse [Defendant's] failure to exhaust, even under the unusual circumstances that the COVID-19 pandemic presents."); *United States v. Ogarro*, 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020) ("In fact, section 3582(c)'s exhaustion proscription is clear as day.   It mandates that where the BOP has not submitted an application for a sentence reduction, a court cannot, *under any circumstances*, grant compassionate release unless the defendant has either fully exhausted all administrative rights to appeal or waited at least 30 days from the receipt of such a request by the warden of the defendant's facility.") (internal marks and citation omitted; emphasis added); *United States v. Lugo*, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (declining to read equitable exceptions into Section 3582(c)(1)(A)'s exhaustion requirement: "The Court regards the language of section 3582(c) as both clear and mandatory."); *United States v. Epstein*, 2020 WL 1808616, at *3 (D.N.J. Apr. 9,

---

[6] Hendry submitted his request for expedited home confinement to the warden at FCI Jesup on April 20, 2020.

2020) ("While judicially created exhaustion requirements may sometimes be excused, it is well settled that a court may not ignore a statutory command, such as the one imposed in Section 3582(c)(1)(A)."); *United States v. Johnson*, 2020 WL 1663360, at \*3–6 (D. Md. Apr. 3, 2020) (denying request for compassionate release based on COVID-19 pandemic; concluding that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional and, regardless, there are no exceptions to the exhaustion requirement); *United States v. Kumar*, 2:18-cr-14063, Doc. No. 157 (S.D. Fla. Apr. 14, 2020) (Marra, J.) (same); *United States v. Carter*, 2020 WL 1808288, at \*1 (S.D. Ind. Apr. 9, 2020) (same); *United States v. Holden*, 2020 WL 1673440, at \*5-10 (D. Or. April 6, 2020) (same); *United States v. Carver*, 2020 WL 1604968, at \*1 (E.D. Wash. Apr. 1, 2020) (same); *United States v. Zywotko*, 2020 WL 1492900, at \*1–2 (M.D. Fla. Mar. 27, 2020) (same); *see also Cruz-Pagan v. Warden, FCC Coleman-Low*, 486 F. App'x 77, 78-79 (11th Cir. 2012) (holding that prior version of Section 3582(c)(1)(A), which only permitted BOP to bring motions for compassionate release, was mandatory: "The BOP has not made a motion on Cruz's behalf. Accordingly, we do not have the authority to modify his sentence under § 3582(c)(1)(A)."); *cf. Santiago-Lugo v. Warden*, 785 F.3d 467, 475 (11th Cir. 2015) (holding that although "judge-made" exhaustion requirements, as opposed to statutory exhaustion requirements, are not jurisdictional "[t]he exhaustion requirement is still a requirement[.]"); *but see United States v. Minor*, 9:18-cr-80152, Doc. No. 35 (S.D. Fla. Apr. 17, 2020) (Middlebrooks, J.) (holding that 3582(c)(1)(A)'s exhaustion requirement can be excused when "'the interests of the individual weigh heavily against requiring administrative exhaustion.'") (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)).

The United States recognizes there is a split of authority on this issue, with no binding Eleventh Circuit precedent directly addressing 3582(c)(1)(A)'s exhaustion requirement.  The

United States respectfully submits *Minor* was wrongly decided.  To be sure, *Minor* relied on *McCarthy* and *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) to support its conclusion that 3582(c)(1)(A)'s exhaustion requirement can be waived by the Court.  *McCarthy*, however, is inapposite as *McCarthy* expressly found that Congress failed to require exhaustion with respect to the statutory provision at issue in that case.  *McCarthy*, 503 U.S. at 149 ("Congress has not meaningfully addressed the appropriateness of requiring exhaustion in this context.").  *Minor*'s reliance on *Washington* is similarly misplaced.  925 F.3d at 118 (stating that the statute at issue "does not mandate exhaustion of administrative remedies[.]").

Such is not the case here.  Section 3582(c)(1)(A) explicitly states that district courts generally lack authority to modify a prisoner's sentence.  The statute starts by explaining that "[t]he court *may not* modify a term of imprisonment once it has been imposed," except under specified conditions.  18 U.S.C. § 3582(c) (emphasis added).  When a defendant moves for compassionate release under Section 3582(c)(1)(A)(i) based on "extraordinary and compelling reasons," the Court's authority to act is conditioned upon the exhaustion of administrative remedies or BOP's failure to act after the elapse of 30 days.

Congress made clear in Section 3582(c)(1)(A) that a district court may not modify a term of imprisonment once it has been imposed unless the conditions set forth in the statute, including the exhaustion requirement, have been satisfied.  The distinction makes all the difference.  The mandatory language of the statute "means a court may not excuse a failure to exhaust, even to take [special] circumstances into account." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).  With a statutory exhaustion requirement, "Congress sets the rules – and courts have a role in creating exceptions only if Congress wants them to." *Id*. at 1857.  "[M]andatory exhaustion regimes, foreclos[e] judicial discretion." *Id*.; *see also McCarthy*, 503 U.S. at 144 ("Where Congress

8

specifically mandates, exhaustion is required."); *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998) (same); *Woolley*, 9:19-cr-80093, Doc. No. 105 (S.D. Fla. Apr. 17, 2020) (same).   Here, the rules set by Congress prohibit this Court from modifying a defendant's sentence unless the defendant first exhausts BOP's administrative remedies, or the warden fails to timely act on the defendant's request.   Indeed, the Supreme Court has explained that courts should "not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."   *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).

The case for carving out equitable exceptions to Section 3582(c)(1)(A)'s exhaustion requirement is especially weak here because the statute itself provides an exception, permitting a defendant to seek judicial review—even if he has not yet fully exhausted his administrative rights—where 30 days have elapsed from the warden's receipt of the defendant's request.   This built-in exception to the statutory exhaustion requirement further suggests that courts have no role in creating additional exceptions to what Congress has mandated.

Congress chose to vest BOP with the authority to address requests for compassionate relief in the first instance.   To disregard this mandate under the present circumstances would raise serious separation of powers concerns.   The Court should allow BOP to assess Hendry's health and its own ability to address any health risks he may have related to COVID-19 or otherwise.

The United States recognizes that these are unsettling times for everyone, including prisoners.   But against this backdrop, Section 3582(c)(1)(A)'s exhaustion requirement becomes even more paramount.   "The requirement recognizes that the BOP is better positioned than the courts to first assess issues such as a defendant's health, the adequacy of the measures taken by a particular place of incarceration to address any health risks, the risk presented to the public by a defendant's release, and the adequacy of a defendant's release plan."   *United States v. Cornett*,

9

2020 WL 1912211, at *2 (E.D. Ky. Apr. 20, 2020); *see also Raia*, 2020 WL 1647922, at *2 ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance [amid the risks posed by COVID-19]."); *Lugo*, 2020 WL 1821010, at *5 ("BOP, which possesses greater knowledge of the COVID-19 conditions within its prisons and of Mr. Lugo's specific situation, must be given the first opportunity to respond to Mr. Lugo's request for release before it comes to this Court."); *United States v. Fevold*, 2020 WL 1703846, at *1 (E.D. Wis. Apr. 8, 2020) ("Not only is exhaustion of administrative remedies required as a matter of law, but it also makes good policy sense.   The warden and those in charge of inmate health and safety are in a far better position than the sentencing court to know the risks inmates in their custody are facing and the facility's ability to mitigate those risks and provide for the care and safety of the inmates.").

**B.**    ***A Sentence of Home Confinement Would Undermine the Section 3553(a) Factors.***

Assuming, *arguendo*, the Court does have the authority to consider the instant motion, reducing Hendry's sentence of imprisonment to home confinement is inconsistent with the Section 3553(a) factors.

### *Nature and Circumstances of the Offense*

TentLogix is a Florida corporation that provides event-related services, including the rental and installation of tents and other temporary structures, for private and corporate gatherings throughout the continental United States.   Hendry founded TentLogix and is the chief executive officer and majority owner of the corporation.   From January 2016 to March 2018, TentLogix employed scores of aliens knowing those aliens had entered and remained in the United States unlawfully.   During this time frame, a large portion of TentLogix's workforce in the Southern

District of Florida was comprised of aliens who were not authorized to work in the United States. (PSI at ¶¶ 9-10, 12.)

In 2016, TentLogix generated more than $21,000,000 in gross receipts and $10,000,000 in gross profit from its business operations.   In 2017, TentLogix generated more than $36,000,000 in gross receipts and $14,000,000 in gross profit from its business operations.   (Doc. No. 84, Stipulation of Facts and Acknowledgment of Offense Elements in Support of Guilty Plea, at pg. 1; PSI at ¶ 11.)   By all accounts, TentLogix was a successful and profitable corporation – built off the sweat and toil of an illegal workforce.

On April 11, 2016, Homeland Security Investigations ("HSI") served TentLogix with a Notice of Inspection.   HSI requested TentLogix to produce Form I-9s for all of its employees. (Doc. No. 84 at pg. 2; PSI at ¶ 13.)

On April 26, 2016, TentLogix provided HSI with Form I-9s for approximately 164 employees in response to the Notice of Inspection.   On July 19, 2016, based on a review of the Form I-9s that TentLogix provided, HSI identified 96 TentLogix employees who appeared to be aliens unauthorized to work in the United States.   HSI provided TentLogix with a list of the 96 employees, and warned TentLogix it could be subject to criminal charges if it continued to employ these aliens.   Hendry was aware of HSI's audit and HSI's admonition to TentLogix that it could be subject to criminal charges if it continued to employ aliens who were not authorized to work in the United States.   (Doc. No. 84 at pg. 2; PSI at ¶ 14.)

In summary, HSI provided TentLogix with the opportunity to bring itself into compliance with federal law in lieu of facing criminal sanctions.   Instead of heeding HSI's admonition, TentLogix, through its corporate officers, Hendry and Birdsall, orchestrated a façade of

11

compliance that permitted the corporation to continue profiting from the use of illegal labor for at least another year.

Specifically, in early 2017, Hendry, Birdsall, and Hughes met at Hendry's residence in Martin County, Florida, and devised a scheme to "transfer" the aliens employed by TentLogix who were not authorized to work in the United States to KH Services, LLC ("KH Services"), which was to be established by Hughes, so that they no longer appeared on TentLogix's payroll.   Hughes and Hendry were childhood friends and Hendry manipulated that relationship to convince Hughes to participate in the conspiracy.   The purpose of the scheme was to conceal, harbor, and shield the aliens who worked for TentLogix from HSI's audit.   Hendry was the architect of the unlawful scheme.   To put it in Hendry's own words, "[t]he genesis of the idea was mine and mine alone." Hendry agreed to cover all of the costs associated with KH Services, and agreed to pay Hughes a fee for each alien who was transferred from TentLogix's payroll to KH Services' payroll.   (Doc. No. 84 at pgs. 2-3; PSI at ¶ 15; Doc. 129 at pg. 2.)

Hendry directed Birdsall to make GMC, who was a supervisor at TentLogix, aware of the scheme.   At Hendry's behest, Birdsall directed GMC to tell the aliens employed by TentLogix to obtain new identities, including social security numbers, which GMC did.   GMC was primarily responsible for recruiting the aliens who worked for TentLogix, most of whom were from Guatemala.   (Doc. No. 84 at pg. 3; PSI at ¶ 16.)

Hendry then directed Birdsall to tell TentLogix's attorney to falsely represent to HSI that TentLogix was in the process of terminating the 96 employees HSI had identified during its audit as aliens not authorized to work in the United States.   (Doc. No. 84 at pg. 3; PSI at ¶ 17.)   Over the course of several communications in 2017, TentLogix notified HSI, through its counsel, that most of the aliens identified by HSI had been terminated.   These communications were made

between TentLogix's attorney and HSI Special Agent Dadre McCreary.   Simply put, TentLogix, through its corporate officers, intentionally duped an unwitting attorney into lying to a federal law enforcement agency.

On March 20, 2017, Hughes formed KH Services for the sole purpose of concealing, harboring, and shielding the aliens employed by TentLogix from HSI's audit.   In April 2017, Birdsall delivered a $10,000 check to Hughes issued by TentLogix and made out to KH Services. On April 19, 2017, Hughes opened an account at Wells Fargo in Martin County in the name of KH Services and deposited the $10,000 check into that account.   Hughes was the sole member and manager of KH Services.   Hughes operated KH Services out of his residence in Martin County.   (Doc. No. 84 at pg. 3; PSI at ¶ 18.)

On May 5, 2017, TentLogix, through its attorney, lied to HSI and falsely represented that 92 of the 96 aliens identified by HSI during its audit had been terminated when, in fact, those aliens continued to work for TentLogix under the guise of being employed by KH Services.   (Doc. No. 84 at pg. 3; PSI at ¶ 20.)

In May 2017, most of the employees HSI had previously identified as aliens not authorized to work in the United States were transferred from TentLogix's payroll to KH Services' payroll. These aliens continued to work for TentLogix while purportedly being employed by KH Services. (Doc. No. 84 at pg. 3; PSI at ¶ 19.)

Between May 2017 and March 2018, TentLogix transferred over $3,000,000 to KH Services in 23 separate wire transfers for the express purpose of paying the aliens who continued to work for TentLogix.   At Hendry's direction, Birdsall provided Hughes with the hours worked and hourly rate for each alien on a bi-weekly basis based on timesheets he maintained at TentLogix.   Birdsall maintained a code or "Rosetta Stone" that permitted him to identify each

alien so that they correlated with the timesheets he provided to Hughes.   Hughes then transmitted this information to Paychex, Inc. ("Paychex"), a payroll services provider, so that paychecks drawn on KH Services' bank account at Wells Fargo were generated for the aliens who worked for TentLogix.   After the paychecks were issued, Birdsall obtained the paychecks from Hughes and caused them to be distributed to the aliens at TentLogix's headquarters in Fort Pierce.   (Doc. No. 84 at pgs. 4; PSI at ¶¶ 21-22.)

On March 28, 2018, HSI executed a federal search warrant at TentLogix's headquarters in Fort Pierce.   The façade of compliance finally collapsed.   During the execution of the search warrant, HSI encountered and interviewed no less than 30 of the aliens TentLogix previously advised had been terminated, several of whom provided false identities to law enforcement at the scene.   These aliens worked for TentLogix but received their paychecks through KH Services. Contrary to Hendry's representation, HSI is not aware of a single DACA recipient that was arrested or encountered during its investigation of TentLogix.

To recap, Hendry orchestrated a fraudulent scheme that spanned several years, resulted in the harboring of at least 92 aliens, involved the formation and use of a shell company, the obstruction of a criminal investigation, and the use of an innocent attorney who repeatedly lied to a federal law enforcement agency at TentLogix's behest.   There was a distinct absence of mistake in how Hendry perpetrated this crime.   Hendry's actions were purposefully calculated to deceive.

As for Hendry's motive, he benefited directly and substantially from the conspiracy.   In 2017, during the height of the conspiracy, TentLogix generated more than $36,000,000 in gross receipts and $14,000,000 in gross profit from its business operations.   From April 2016 until March 2018, Hendry withdrew over $1,000,000 from TentLogix's bank account.   Hendry profited financially more than any other member of the conspiracy.

Moreover, this was not a trivial crime.   It is no secret that one of the primary reasons for illegal immigration is the chance of employment in the United States.   The ability of illegal aliens to find and keep jobs depends to a considerable extent on unscrupulous employers willing to either look the other way, or, as here, actively obstruct immigration authorities.   When enacting Section 1324, Congress expressly noted the pervasive problem of illegal alien employment and its harmful effect on the American worker.   *United States v. Zheng*, 306 F.3d 1080, 1087 (11th Cir. 2002). "Each time an employer hires an illegal alien, an American citizen loses an employment opportunity."   *Id.*   Congress understood this problem and chose to penalize employers for hiring illegal aliens and harboring them from detection.

To be clear, TentLogix was founded based on the use of illegal labor and enjoyed the fruits of an illegal workforce for many years.   Hendry did far more than simply employ "undocumented workers as a business practice."   Hendry perpetrated an elaborate fraud against HSI that spanned several years and resulted in the obstruction of a criminal investigation.

The nature and circumstances of the present offense counsel against reducing Hendry's sentence of imprisonment to home confinement.

### *History and Characteristics of the Defendant*

The United States acknowledges Hendry's criminal history is minimal.   Hendry's lack of criminal history, however, has already been adequately taken into account by virtue of his criminal history designation (Category I).   Criminal history category I is the lowest category, and "the lower limit of the guideline range for Criminal History Category I is set for a first offender with the lowest risk of recidivism."   USSG § 4A1.3 (policy statement).   On the other hand, the fact Hendry turned to crime later in life is particularly disconcerting.

15

The United States does not dispute that Hendry's background reveals instances of good character on his part.   Nevertheless, Hendry's prior good deeds, on balance, do not negate the gravity of his conduct and aggravating role he played within the conspiracy.   Criminal defendants are not entitled to receive "credits" for their prior good deeds to offset the prospect of incarceration. To hold otherwise would encourage white collar defendants to engage in risk/reward calculations before they commit financial crimes based on how many "good deeds" they have accumulated or how much money they have contributed to charitable causes.

### The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, Afford Adequate Deterrence, and Protect the Public from Further Crimes of the Defendant

The offense Hendry now stands convicted of is both serious and dangerous to the administration and enforcement of federal immigration law.   "[T]he legislative history of the adoption of § 3553 demonstrates [that] Congress viewed deterrence as particularly important in the area of white collar crime."   *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal marks and citation omitted).   That is because white collar crime, more so than most other offenses in the criminal code, "can be affected and reduced with serious punishment."   *Id*.   A sentence of home confinement would send the message that white collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty.   Rather than deter crime, a sentence of home confinement would suggest to those similarly situated to Hendry that they can profit from fraudulent conduct and, even if caught, escape severe consequences by cooperating with the government after the fact.   The threat of spending time on home confinement simply does not, and cannot, provide the same level of deterrence as the threat of incarceration in a federal penitentiary for a meaningful period of time.   As the Court noted when pronouncing Hendry's sentence:

16

It is important that there be a sentence that promotes respect for the law. It is concerning, albeit I heard the reasons why, that the office that has been investigating the matter -- I want to make sure -- HSI gave you an opportunity to comply, and maybe more than one opportunity, and there must be regard for what it means to respect the law, including respecting the law enforcement officials who are charged by their duty and responsibility in their capacity to do what is right under the law and to have afforded you an opportunity to comply, to perhaps have avoided criminal prosecution that ultimately led you to make a decision that was one that ran afoul of the law, and therefore did not in that instance show or manifest respect for the law.

. . . .

Your employees were lucky and others are not.   There has to be general deterrence so other companies will not have an adverse impact on human lives.

(Sentencing Transcript at pgs. 33-34.)

At present, Hendry has served less than a week of his sentence.  A sentence of home confinement at this juncture fails to account for the seriousness of his offense, promote respect for the law, provide just punishment for the offense, or afford adequate general deterrence.

**C.**      *Hendry has Failed to Establish Extraordinary and Compelling Reasons Justifying a Modification of His Sentence.*

The authority to define "extraordinary and compelling reasons" has been granted to the United States Sentencing Commission, which has defined that term at USSG § 1B1.13, comment n.1.   As relevant here, Section 1B1.13 defines "extraordinary and compelling reasons" as follows:

(A) Medical Condition of the Defendant.

. . . .

(ii) The defendant is--

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the

17

> defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, App. Note 1(A)(ii).

Hendry is 53 years old and currently suffers from hypertension, diverticulitis, acid reflux, mitral valve disorder, hyperlipidemia, and sleep apnea.   (PSI at ¶¶ 60-61; *see also* Doc. No. 182 at pg. 5.)   The United States does not dispute that Hendry suffers from these medical conditions, nor does the United States dispute that at least one of these conditions, hypertension, would place him in a higher risk category were he to contract COVID-19.   This, however, is where the United States and Hendry part ways.

The existence of a widespread health risk, such as COVID-19, is not, *without more*, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid service of that sentence.   Hendry is currently being housed at FCI Jesup. As of the date of this filing, FCI Jesup has no reported positive cases of COVID-19.[7]   *See Hylander*, 2020 WL 1915950, at *2 (denying motion for compassionate release for 66-year-old inmate housed at FCI Jesup suffering from chronic hypertension, edema, gastroesophageal reflux disease, stomach ulcers, and high cholesterol: "[T]he intention in increasing the availability of home confinement is to target facilities like FCI Oakdale, Danbury, and Elkton, at which COVID-19 is materially affecting operations.   There is no indication that FCI Jesup is similarly situated, nor has there been a finding that COVID-19 is materially affecting operations at that facility.").

---

[7] https://www.bop.gov/coronavirus/ (Apr. 24, 2020).

Notably, BOP, which is responsible for the custody and care of more than 171,000 federal inmates,[8] has significantly modified its operations in light of the COVID-19 pandemic.[9]   It has suspended all social visits, limits inmate movement, screens inmates for symptoms and temperature elevations, and, if present, isolates symptomatic inmates.[10]   Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution.   In short, BOP has implemented a COVID-19 action plan designed to minimize the risk of transmission into and throughout its facilities.[11]

The United States recognizes the serious health risks presented by COVID-19, and is sensitive to the challenges COVID-19 poses to incarcerated persons.   The COVID-19 pandemic, however, cannot be the sole basis for releasing a defendant from custody after serving less than a week of a year-long sentence.   "[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."   *Raia*, 2020 WL 1647922, at *2.

Hendry has simply failed to demonstrate that he is "suffering from a serious physical or medical condition[,] . . . a serious functional or cognitive impairment, or experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes [his] ability .

---

[8]  https://www.bop.gov/about/agency/ (Apr. 24, 2020).

[9]  https://www.bop.gov/coronavirus/covid19_status.jsp (Apr. 24, 2020).

[10]  *Id.*

[11]  https://www.bop.gov/resources/news/20200319_covid19_update.jsp (Apr. 24, 2020).

. . to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover."  USSG § 1B1.13, App. Note 1(A)(ii).[12]

## CONCLUSION

For the above stated reasons, the United States respectfully submits Hendry's Motion for Modification of Sentence and Other Relief is due to be denied.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:    **/s/Michael D. Porter**
Michael D. Porter
Assistant United States Attorney
Florida Bar# 0031149
101 South U.S. Highway 1
Suite 3100
Fort Pierce, Florida 34950
Telephone: (772) 293-0950
Email:michael.porter2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.   All other parties will be served by either regular U.S. mail or inter-office delivery.

**/s/Michael D. Porter**
Michael D. Porter
Assistant United States Attorney

---

[12] That Hendry has failed to demonstrate extraordinary and compelling reasons sufficient to warrant a modification of his sentence under Section 3582(c)(1)(A)(i) does not mean he is ineligible for release to home confinement under 18 U.S.C. § 3624(c)(2).   That decision, however, falls within BOP's purview.

20